[No. 16185.  Department Two.  April 8, 1921.]

E. C. SCHMIEGELOW, *Appellant*, v. OCEAN BROKERAGE COMPANY, *Respondent*.[1]

BROKERS—DUTIES AND LIABILITIES TO PRINCIPAL—PERFORMANCE OF AGREEMENT—NEGLIGENCE. Where a customs broker was designated in a local bill of lading as consignee of a shipment of beer, and authorized to procure its clearance and foreign transshipment, but, owing to the seizure and subsequent destruction of the beer by the public authorities he never had possession nor control of the goods, he could not be held liable for the loss of the goods as a bailee for hire under the doctrine of constructive bailment.

Appeal from a judgment of the superior court for King county, Dykeman, J., entered June 30, 1920, dismissing an action to recover the value of beer destroyed by the sheriff, upon granting a nonsuit. Affirmed.

*Howard G. Cosgrove*, for appellant.

*Kerr, McCord & Ivey* (*Wm. Z. Kerr*, of counsel), for respondent.

MITCHELL, J.—The plantiff, E. C. Schmiegelow, doing business as the American Pacific Company (hereinafter called the Pacific Company), claimed to have sold, in October, 1918, to Cargill's, Ltd., of Colombo, Ceylon, four hundred cases of Wieland's beer for the sum of $6,185.00, delivered at Colombo (freight and insurance paid by the seller); and, in order to meet the contract, purchased four hundred cases of beer from the manu-

[1]Reported in 197 Pac. 323.

facturers, and on October 22, 1918, delivered it, for shipment to the purchaser, to the American Asiatic Company (hereinafter called the Asiatic Company), at San Francisco, California. The Asiatic Company issued to the Pacific Company its so-called through bill of lading for the goods, designating Cargill's, Ltd., at Colombo as consignee, and providing the shipment should be forwarded on the steamer Rainier (owned and operated by Albers Bros. Milling Company) to Seattle, and thence by the steamer Admiral Mayo (owned and operated by the Pacific Steamship Company) to the Orient. On the same day, October 22, 1918, L. A. McBride of the Asiatic Company received from Albers Bros. Milling Company a non-negotiable receipt or shipping order covering the four hundred cases of beer, for transportation by its steamer Rainier to Seattle, naming the defendant as consignee with directions on the receipt or shipping order to "notify the collector of customs, Seattle."

The steamer Rainier arrived in Seattle on November 2, 1918. The beer was unloaded that morning, and at once an agent of the United States department of justice came to the dock to take possession of the shipment and remove it; but, by an arrangement satisfactory to the government's agent, it was left at the dock under lock and key subject to the order of the Federal authorities. On November 4, 1918, the beer was seized by the sheriff under an order of the justice of the peace, before whom such proceedings were had that, on the 19th day of November, 1918, there was entered an order and judgment of forfeiture and of destruction of the beer, which order of destruction was carried out by the sheriff on or about November 27, 1918. This suit was instituted to recover from the defendant the sum of $6,185, the price at which the goods were to be de-

livered at Colombo. The trial resulted in a judgment of nonsuit, from which the plaintiff has appealed.

Other facts in the case are substantially as follows: In handling the shipment for the Pacific Company, the Asiatic Company acted as a forwarding merchant only, and not as a common carrier. At the time of issuing its so-called through bill of lading to the appellant, the Asiatic Company, upon referring to the Rainier bill of lading or shipping order, agreed in writing,

"that this shipment will be transshipped from Seattle by November 15 and transshipped from Hong Kong within five days after arrival at that port. It is further understood and agreed that this company will pay all transshipment charges,"

whereupon the Pacific Company paid to the Asiatic Company $2,097.30 and took its receipt therefor in full for all freight charges on "four hundred cases beer, San Francisco to Colombo via Seattle and Hong Kong." Under date of October 31, 1918, the Asiatic Company wrote to the respondent as follows:

"Gentlemen:

"Herewith please find shippers' declaration export license No. 5421886 and original shipping receipt covering 400 cases of beer forwarded by us, consigned to you on the Albers Brothers Steamer 'Rainier'. Also copy of American Asiatic Export Bill of Lading No. 109.

"Will you kindly arrange for the reforwarding, if possible, of this shipment on the Pacific Steamship Company's steamer 'Admiral Mayo', and if not, on the motor ship 'Libby Main', to Hong Kong, at ocean rate of $40 per ton as booked by us in the Seattle office of the Pacific Steamship Company, billing on us for all charges incurred which will include your charge for handling also reclearing shipment at Seattle, storage charges while awaiting transshipment by the Pacific

Steamship Company and any other charges which might be assessed against this shipment.

"We will have about ten shipments to move through Seattle during December and will communicate full details to you in the course of the next few days."

On November 5, 1918, respondent replied, as follows:

"Gentlemen:

"We beg to acknowledge receipt of your letter of October 31st. However, we wish to state that the same was received by us at 3 p.m. on November 5th, in a plain envelope, postmarked Seattle, Washington, Terminal Station A, November 4, 11 p.m. We are at a loss to determine who received this letter and reforwarded it to us.

"However, we were very glad to receive copy of your bill of lading, original local bill of lading, shipper's export declaration in triplicate and U. S. export license No. 5421886.

"Several days ago we received a letter from Mr. R. S. Wheeler, enclosing a copy of the local bill of lading and stating that original papers had been sent to the Pacific Steamship Co. We were on the lookout for the shipment and when same arrived on the S. S. Rainier, on Nov. 2, we endeavored to secure original papers from the Pacific Steamship Co., but the party handling the transaction was not in all day Saturday and it was necessary to wait until Monday. They advised us on Monday morning that they only held duplicate copies, therefore, they were of no value to us.

"In the meantime, the sheriff's office had located the shipment on Albers Bros. dock and had applied to the prosecuting attorney to writ of seizure, who in turn applied to Mr. Saunders, the U. S. district attorney, who gave them authority to transfer the shipment to Messrs. Winn & Russell bonded warehouse No. 1, to be held until such time as owners of the goods had produced proper evidence that same was a *bona fide* shipment to the Orient.

"The writer personally appeared before Mr. Saunders and endeavored to show by the carbon

copies of the bill of lading, internal revenue draw back and various other papers which we held, that same was a *bona fide* shipment, but he absolutely refused to accept carbon copies, stating that he must have the originals and that shipment would be held until such time as we could produce them. We immediately wired Mr. Wheeler regarding the details, also asking for full explanation. At this writing, 4 p.m., Nov. 5th, we have not yet had a reply from him. However, we believe that we will be able to have this shipment released on the strength of the papers which we have just received from you.

"We wish to thank you for this business and assure you that same will have our careful attention. We are also pleased to note that you will have several other shipments moving through this port during December and we will be glad to give same prompt attention.

"At this time we would like to suggest that you mail us all original papers immediately upon the shipment moving from San Francisco, in order that we may have them in our possession to show to the Federal authorities in this city, in case they attempt another seizure. They have threatened to indict our firm, Albers Bros. S. S. Co. and every one else connected with this shipment, as they firmly believe that same was not a *bona fide* shipment.

"However, we were able to point out a few facts to them, which at least made them recede slightly from their position. We will make every endeavor to clear the shipment immediately and will keep you advised as to the status of the case."

This letter was received by the Asiatic Company on November 8, 1918. On November 11, respondent wired to the Asiatic Company,

"Yours eighth Pacific Steamship Company mailed documents covering four hundred cases Colombo beer to their San Francisco office necessary you secure and return these documents mail us at once to obviate loss draw back and effect clearance and release";

to which no answer was made nor attention given by the Asiatic Company.

It appears the respondent had no actual notice of the dates and steps being taken by the state authorities until on or about November 20 (the date following the order of confiscation made by the justice of the peace), at which time he wired to the Asiatic Company:

"Your wire eighth Federal authorities have released Colombo beer same has now been seized by state authorities who threaten to dump shipment necessary we file immediate claim with state attorney furnishing conclusive proof that same is *bona fide* shipment this is court procedure advise quick if you authorize this expense in protecting shipment."

On the same day, the Asiatic Company by wire authorized the respondent to incur expense in court proceedings. Promptly, the respondent employed attorneys who, on behalf of the appellant herein, made an application to the justice of the peace to reopen the case, and on November 22, 1918, procured an order on the sheriff notifying him that a motion to reopen the case had been made and would be heard on November 26, and ordering him to return the order theretofore handed him directing the destruction of the beer. On November 26, the justice of the peace, upon arguments had, denied the motion and application to set aside the judgment of forfeiture. The attorneys then representing this appellant on the same day gave notice of appeal to the superior court. The appeal finally came on for hearing in the superior court on June 30, 1919, at which time a judgment was entered reciting a dismissal on the motion of the State of Washington and further providing therein that, "the said decision and judgment of said justice of the peace be and the same is hereby affirmed", and providing therein for costs against the

Ocean Brokerage Company and further adjudged that the clerk be and he was directed to pay the costs out of cash which had been deposited in lieu of an appeal bond and the remainder to be returned to the appellant therein. It appears from the record that the money in the superior court, furnished in lieu of an appeal bond, had been supplied by the Asiatic Company on or about November 26, 1918.

The case has some peculiar features. The party who brings this action never had any correspondence or agreement with the Ocean Brokerage Company prior to the time the justice of the peace entered a default order of confiscation of the beer, nor until after all the court proceedings and the destruction of the beer. For the transportation of the commodity, the Pacific Company entered into a contract with the Asiatic Company, which was not a common carrier, by which the latter company agreed, for a stipulated sum of money paid to it, to look after and meet all charges for the transportation of the beer from San Francisco to Colombo. It was the undertaking of an independent contractor under no obligation as a common carrier. In the performance of its contract, the Asiatic Company selected the route by Seattle. It procured from the owner of the steamer Rainier a shipping order or local bill of lading for the transportation of the goods from San Francisco to Seattle, directed to the respondent at the latter place as consignee, with directions to him to notify the collector of customs at Seattle.

In the further performance of its contract, the Asiatic Company, by its letter of October 31, 1918, and enclosures, selected the services of the respondent who, by its answer of November 5, agreed to act for the Asiatic Company. In its proper aspect, however, it is immaterial whether the respondent be considered the

agent of the appellant or of the Asiatic Company—the result would be the same. Certainly the respondent, in all of the transaction it was engaged to perform, was justified in dealing directly with the Asiatic Company, rather than with the appellant. The respondent was engaged as a customs broker only. That is evidenced by the directions on the shipping order designating him as consignee, by the letter and enclosures from the Asiatic Company of October 31, and by the respondent's reply on November 5. When it received authority to act in that capacity, the goods had already passed beyond the possession and control of the local transportation company and were in the control of the United States district attorney in Seattle. Immediately upon its engagement, the respondent, with the documents and proof at its command, attempted to get a release of the goods from the Federal authorities for reshipment. The proof was insufficient in certain particulars of which the Asiatic Company was promptly notified. At the same time, it was notified of the effort being made by the respondent to procure other papers necessary, and in the same letter notice was given that the United States attorney had given the state authorities, who had become interested in the goods for the purpose of seizure, leave to transfer the goods from the dock to a designated place, "until such time as the owners of the goods had produced proper evidence that the same was a *bona fide* shipment to the Orient."

This advice was unheeded by the Asiatic Company, and it appears that, on learning that the Pacific Steamship Company, which was intended to take the shipment from Seattle, had returned to its San Francisco office certain original documents needed, the respondent wired to the Asiatic Company on November 11, for the return of those documents at once "to obviate loss draw

back and effect clearance and release.'' The telegram, though received by the Asiatic Company, was also neglected. Thus it appears the respondent acted diligently and within the knowledge of the Asiatic Company as a customs broker only. It received no assistance from the Asiatic Company or at all, and until later received no instructions to act in any other capacity. Later, when respondent, without actual notice of the proceedings before the justice of the peace, learned the situation with the officers of the state, it promptly notified the Asiatic Company and asked for authority to employ counsel for court proceedings; and, upon receiving such authority, did employ attorneys at once to take the matter up in the justice of the peace court and thence on to the superior court.

Counsel for appellant argues that, since the local bill of lading or shipping order designated the respondent as consignee, it became a bailee for hire and under the circumstances in this case it became liable under the doctrine of constructive bailment. We find it unnecessary to consider the argument or authorities cited, since it is clear there was never a time after the respondent was engaged that it was in the power of the appellant, the Asiatic Company, or of Albers Bros. Milling Company to put the respondent in possession and control of the goods. The respondent's duties and obligations were fixed not by any bailment, constructive or otherwise, but by the letter of October 31 from the Asiatic Company to the respondent, and its reply thereto on November 5, 1918, under which, as disclosed by the record, it appears to have acquitted itself without any liability.

Judgment affirmed.

PARKER, C. J., MAIN, TOLMAN, and MOUNT, JJ., concur.